**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA

v.

Case No. 5:24-cr-00062-MIS

COREY PARTICK SAFFELL,
CEASAR ENRIQUE MENDOZA,
and ROBERT EDWARD EMBLY,

Defendants.

**ORDER DENYING DEFENDANTS' MOTION AND GOVERNMENT'S REQUEST FOR MISTRIAL**

THIS MATTER is before the Court on Defendant Ceasar Enrique Mendoza's ("Defendant Mendoza") Motion for Mistrial ("Motion"), ECF No. 291, filed on July 13, 2026. The Government filed a response ("Response") on July 27, 2026, ECF No. 305, in which it made a separate request for a new trial, *see id.* at 6-12. Defendant did not file a reply. *See* ECF No. 296 (ordering a reply by July 30, 2026). Defendant Robert Edward Embly ("Defendant Embly") joined both Defendant Mendoza's Motion for Mistrial and the Government's requests for a new trial. Notice at 1, ECF No. 306. Upon review of the Motion and Response, the record, and the relevant law, the Court will deny Defendant's Motion and the Government's request.

## I. Background

On the evening of July 30, 2021, Defendants Embly and Mendoza were called by a fellow Jal, New Mexico police officer, Corey Patrick Saffell, to assist Officer Saffell during a traffic stop. *See* Mot. at 2-3, ECF No. 291. Officer Saffell pulled over John Doe because Doe was operating his vehicle erratically. *Id.* Based on Doe's actions and his responses to Officer Saffell's questions, Officer Saffell believed Doe was intoxicated. *Id.* at 3-4. The three officers proceeded to arrest Doe and, during the arrest, drive stunned Doe with a taser fourteen times. *Id.* at 5; Resp. at 6, ECF No.

305. Once officers reached the police station they pulled a limp, unconscious Doe out of the police car and dragged him to a cell. *See e.g.,* Tr. of Jury Trial Vol. II of IX at 124:1-13. It was apparent when they pulled him out of the car that he had urinated all over himself. *Id.* Rather than provide medical assistance, Officers placed Doe face down in the cell and he died at the Jal Police Station. Mot. at 6, ECF No. 291.




*Government Exhibit 12 showing officers dragging a limp Doe covered in his own urine through the Jal Police Station booking room on the night of July 30, 2026.*

The medical examiner's report listed the cause of death as "toxic effects of methamphetamine," known colloquially as an overdose. ECF No. 139-3 at 1-7.

The three officers were indicted under 18 U.S.C. § 242 for excessive use of force, failure to intervene, and deliberate indifference to a serious medical need. Superseding Indictment, ECF No. 53; Order on Superseding Indictment, ECF No. 243. Officer Saffell pled guilty. Plea Agreement, ECF No. 86.

Prior to trial, the Government moved to exclude the medical examiner's report and evidence of Doe's prior drug use. Govt's Mot. in Limine, ECF No. 131. Defendant Mendoza filed a response in opposition. Def. Mendoza's Resp. to Gov't Mot. in Limine, ECF No. 148. Defendant Embly did the same, Def. Embly's Resp. to Gov't Mot. in Limine, ECF No. 151, and filed a Motion in Limine arguing such evidence should be introduced, ECF No. 139. The Court ruled on the Motions prior to trial ("Order"), finding under a Federal Rule of Evidence 403 ("Rule 403")

analysis the report and Doe's prior methamphetamine use had minimal to no probative value because the results of the report and his prior drug use were not known by officers at the time of arrest, and any probative value was substantially outweighed by the risk the information would confuse the jury, would be needlessly cumulative, and would be more prejudicial than probative. Order at 3-17, ECF No. 226.

In February 2025, at the conclusion of a jury trial, Defendant Mendoza was convicted of one count of deprivation of rights by excessive force with a dangerous weapon, meaning a taser, under 18 U.S.C. § 242, Jury Verdict at 1, ECF No. 245; Tr. of Jury Trial Vol. VII of IX at 45:2-15, ECF No. 280; Defendant Embly was convicted of one count of deprivation of rights by failing to intervene during the use of a dangerous weapon under § 242, Jury Verdict at 1-2, ECF No. 245; and both Defendants were found guilty of one count of deliberate indifference to a serious medical need involving a dangerous weapon under § 242, *id.* at 2. The taser was introduced as evidence at trial and included a label identifying it as capable of causing death or serious injury. Tr. of Jury Trial Vol. VII of IX at 98:20-23, ECF No. 280 ("And you can see that there is a label (indicating). And this is also in some of the exhibits that are photographs. And on that label, you will see it says that the TASER can cause death or serious injury.").

Defendants were initially scheduled to be sentenced thirteen months ago. ECF Nos. 247, 248. The Court granted Defendant Mendoza's first motion to continue sentencing, ECF No. 258, and rescheduled sentencing for September 9, 2025, ECF Nos. 259, 260. Then, Defendant Embly moved to continue sentencing. ECF No. 264. The Court granted that motion as well, ECF No. 269, and, on June 9, 2026, scheduled sentencing for August 6, 2026. ECF Nos. 288, 289. On July 10, 2026, Defendant Embly again moved to continue sentencing, ECF No. 290, which the Court denied, ECF No. 299. Sentencing is now delayed because of the Government's separate Motion to

Dismiss under Federal Rule of Criminal Procedure 48(a). *See* ECF No. 319; ECF No. 312. Defendants are out on bond. *See* ECF Nos. 261, 270.

Defendant Mendoza requests a new trial because "[m]any months after the trial," Defendant Mendoza's counsel received "an unsolicited call" from Juror #10 claiming that Juror #1 had looked up extraneous information about whether the taser used by the officers was "deadly." Mot. at 7, ECF No. 291; *see* Affidavit of Juror #10, ECF No. 291-1 (alleging Juror #1 went to the taser manufacturer's website and later told jurors they should see "how dangerous the Tasers are"). Defendant Mendoza argues that the Court should declare a mistrial and order a new trial based on (1) "juror receipt of extraneous information," *id.* at 8-10 (emphasis removed), and (2) the actual and implied bias of Juror #1, *id.* at 10-12.

The Government argues that Juror #1 does not meet the legal standard for actual or implied bias, Resp. at 3-4, ECF No. 305, and, although it believes the information provided is not sufficient to require a new trial, *id.* at 5; Tr. of Hr'g of Aug. 4, 2026 at 14:1-10,[1] requests more time to secure affidavits from Juror #1 and another as yet undetermined juror to confirm Juror #1's actions and determine the effect of the extraneous information, Resp. at 5-6, ECF No. 305.

The Government also makes a separate argument for a mistrial based on the Court's Rule 403 Order granting the Government's request to exclude the medical examiner's toxicology report and evidence of prior drug use. *Id.* at 6-12. Although the Government acknowledges Federal Rule of Criminal Procedure 33 prevents it from filing a motion for a new trial, it believes that because Federal Rule of Criminal Procedure 48(a) permits the Government to dismiss indictments *before*

[1] Neither party ordered the transcript. The Court cites to the Court reporter's original rough draft of the hearing transcript. Any final transcript may contain slightly different page and/or line numbers.

trial, "[i]t would stand to reason" the Government can ask for a new trial after a jury verdict convicting defendants. *Id.* at 2.[2]

The Government argues that the Court should grant Defendants a new trial on counts one and two, excessive force and failure to intervene, because, according to the Government, the Tenth Circuit will find the Court's pre-trial ruling an abuse of discretion due to the probative value of Doe's methamphetamine use as found in the medical examiner's report. *Id.* at 6-10, ECF No. 305. The Government also argues excluding the cause of death as listed in the medical examiner's report resulted in an unfair trial on count three, indifference to a serious medical need, because, despite the jury instruction not to consider the cause of death, the Government implied that the taser use killed Doe. *Id.* at 10-12.

The Government declares that if the convictions were to be appealed to the Tenth Circuit, it "has no desire to defend those convictions." *Id.* at 10.[3]

## II. Legal Standards

### A. Mistrial Based on Juror Bias

Tenth Circuit "law contemplates two types of juror bias: actual and implied." *United States v. Dermen*, 143 F.4th 1148, 1172 (10th Cir. 2025), *cert. denied*, 146 S. Ct. 1622 (2026).

"Actual bias is a '[g]enuine prejudice that a . . . juror . . . has against some person or relevant subject.'" *Id.* (citation omitted). "Actual bias may be shown either by a juror's express admission,

---

[2] After the Court issued a Minute Order denying the instant Motion and request for mistrial, the Government filed an unopposed Motion to Dismiss under Rule 48(a). ECF No. 312. The Court appointed an amicus curiae to argue in opposition to the Motion to Dismiss, ECF No. 320, and briefing on the Motion to Dismiss is not yet complete.

[3] If the Government declines to defend an appeal before the Tenth Circuit, the Court recommends the Tenth Circuit appoint an amicus curiae to do so.

or by proof of specific facts which show the juror has such a close connection to the facts at trial that bias is presumed." *Id.* at 1172-73 (citation omitted).

"Implied bias—also termed 'inherent bias' in some authority—is '[b]ias, as of a juror, that the law conclusively presumes because of kinship or some other incurably close relationship' or 'prejudice that is inferred from the experiences or relationships of a . . . juror.'" *Id.* at 1173 (citation omitted). "'Whether implied bias exists in a juror is a legal determination that turns on an objective evaluation of the challenged juror's experiences and their relation to the case being tried.'" *Id.* (citation omitted). "'Thus, implied bias may be found even though a juror denies any partiality.'" *Id.* (citation omitted) "'Though a juror might honestly believe she can be impartial, she nevertheless may have 'such a close connection to the circumstances at hand that bias must be presumed.'" *Id.* (citation omitted).

"Importantly, [Tenth Circuit] cases make clear that '[t]he implied bias doctrine should not be invoked lightly.'" *Id.* (citation omitted). "[S]ituations that would support a finding of implied bias 'might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Id.* (citation omitted).

**B. Mistrial Based on Extraneous Information**

"The Tenth Circuit has 'developed two different standards . . . to assess the impact of exposure to extraneous material on a jury.'" *United States v. Muessig*, 427 F.3d 856, 865 (10th Cir. 2005) (citing *Smith v. Ingersoll–Rand Co.*, 214 F.3d 1235, 1241 (10th Cir. 2000)). "Under the first standard, a new trial is appropriate if the 'slightest possibility' exists that the exposure to extraneous material affected the verdict." *Id.* (citation omitted). "According to the second standard, however, jury exposure to extraneous information creates a 'presumption of prejudice' which may

be rebutted by a showing that the exposure was harmless." *Id.* (citation omitted). "The difference between the two standards lies in which party has the initial burden of proof." *Id.* (citation omitted). Where error is harmless the Court does not need to reconcile the two standards. *Id.* (citing *Ingersoll-Rand Co.*, 214 F.3d at 1241).

To determine if error is harmless, a court must "assess the possibility of prejudice by 'reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware.'" *Ingersoll-Rand Co.*, 214 F.3d at 1242 (citing *United States v. Hornung*, 848 F.2d 1040, 1045 (10th Cir. 1988)). The entire record excludes "delving into the subjective effect of the contact on the juror's decision-making." *Hornung*, 848 F.2d at 1045. Whether an error is harmless depends on the record in the case, including whether the information is cumulative, whether an instruction is given, and whether the court takes steps to ensure the information did not influence the verdict. *Muessig*, 427 F.3d at 865.

### C. Federal Rules of Criminal Procedure 33 and 48

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." *Id.* 33(b)(2).

"The government may, with leave of court, dismiss an indictment, information, or complaint. The government may not dismiss the prosecution during trial without the defendant's consent." Fed. R. Crim. P. 48(a).

## III. Discussion

The Court is unsure why the Government wishes to wash its hands of convictions that took three and a half years, and significant taxpayer funds, to achieve, nor why the Government declares

its intent to abdicate its responsibility to defend those convictions on appeal, but this Court will not grant a new trial absent a Tenth Circuit order to do so.

The Court first finds that there is no evidence of juror bias that justifies a new trial. Next, the Court finds that the extraneous information researched by Juror #1 was duplicative of information available to jurors—and emphasized by the Government in its closing argument—and therefore does not warrant a mistrial. Finally, the Court finds the Government cannot move for a new trial, but if the Government can move for a new trial the motion is untimely, and even if it were timely, the Court finds its Rule 403 analysis was correct and Defendants received a fair trial.

**A. The affidavit from Juror #10 does not show that Juror #1 was actually or impliedly biased.**

The Court cannot grant a mistrial for juror bias unless a juror is found to be actually or impliedly biased. No evidence here indicates any juror was impliedly or actually biased.

Actual bias means "'[g]enuine prejudice that a . . . juror . . . has against some person or relevant subject.'" *Dermen*, 143 F.4th at 1172 (citation omitted). Impliedly biased means "kinship or some other incurably close relationship" or "prejudice that is inferred from the experiences or relationships of a . . . juror." *Id.* at 1173. (citation omitted). "'[S]ituations that would support a finding of implied bias 'might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction.'" *Id.* (citation omitted).

Defendant Mendoza argues that Juror #1 was both actually and impliedly biased despite conceding no indications of bias on his jury questionnaire or during voir dire. Mot. at 10-12, ECF No. 291. Defendant Mendoza asserts actual and implied bias (he makes no distinction between the

two) based on Juror #1 accessing extraneous information and admitting to it in front of other jurors, paying for other jurors' lunches, and, after the trial concluded, informing other jurors he believed Doe was a "good guy" and inviting other jurors to help him remove prisoners from death row. *Id.*

The Government counters that "the factual situation described in the affidavit falls far short of the situations noted above that indicate an implied bias." Resp. at 3, ECF No. 305 (citing *Derman*, 143 F.4th at 1173). The Government argues the statements made after trial "are [in]sufficient to indicate a disqualifying bias against the Defendants or even law enforcement more generally." *Id.* at 4. The Court agrees.

The standards for actual and implied bias require some sort of relationship between the juror and the subject, participants, or connected entities. *Dermen*, 143 F.4th at 1172-73. Based on the record, Juror #1 has no relationship with any of the participants or surrounding entities, nor is he actually or impliedly biased against the subject at issue. At most, he displays an opinion developed during trial that Doe was a "good guy" and an opinion disagreeing with the death penalty. This was not a death penalty case, and the Court will not presume that opposition to the death penalty means bias against law enforcement, let alone actual or implied bias in this case. The Court will not declare a mistrial due to juror bias.

**B. The extraneous information accessed by Juror #1 did not meet the standard required for a mistrial because the same information was available in evidence and did not impact the charged counts.**

During or before deliberations, Juror #1 allegedly went to the taser manufacturer's website to "see how dangerous" the taser was. *See* Aff. of Juror #10 ¶ 8, ECF No. 291-1. Defendant Mendoza represents this as research to determine "whether the taser was deadly." Mot. at 7, ECF

No. 291. The extraneous information accessed by Juror #1 does not warrant a new trial because it duplicated information available in evidence.

Extraneous information accessed by or provided to jurors may warrant a new trial where "the possibility of prejudice" arises based on a review of "the entire record," an analysis of "the substance of the extrinsic evidence," and a comparison of the extraneous information to "that information of which the jurors were properly aware.'" *Ingersoll-Rand Co.*, 214 F.3d at 1242 (citing *Hornung*, 848 F.2d at 1045).

Defendants argue that when Juror #1 accessed information on the taser-manufacturer's website about the dangerousness of the taser and then told other jurors during deliberations he had done so, it constituted extraneous information sufficient to warrant a new trial. Mot. at 8-10, ECF No. 291. The Government believes the evidence presented is insufficient to show prejudicial effect. Resp. at 5, ECF No. 305; Tr. of Hr'g of Aug 4, 2026 at 14:2-10 ("Our position has been that we don't believe the affidavit is enough. We think there should be an evidentiary hearing. We think the United States should have the right to cross-examine the juror about that. And so there is not enough on this record to grant a new trial, especially given the fact that evidence of the dangerous nature of the TASER did come in and was admitted at trial. And we believe that more than just one juror affidavit would be necessary."). The Government requests more time to get an affidavit from Juror #1 and another juror confirming that Juror #1 accessed extraneous information. Resp. at 5-6, ECF No. 305.

More confirmation would be necessary if the Court found the allegations in Juror #10's affidavit warranted a new trial, especially considering Juror #10 previously contacted the Court after the trial asking for leniency and expressing regret about his vote to convict. *See generally* Sealed Letter, ECF No. 251. The Court would also wish to have Juror #10 testify and be cross-

examined, since Defendant Mendoza declined to bring him as a witness to the Court's hearing on August 4, 2026. Tr. of Hr'g of Aug. 4, 2026, at 3:3-8. The Government, however, can argue about the potential effect of extraneous information without confirmation of Juror #10's affidavit.

A review of the record and the extraneous information, and a comparison of the extraneous information to the evidence at trial, however, confirms there was no prejudice due to access of extraneous information by Juror #1.

The jury already had the information accessed by Juror #1 and that information was highlighted by the Government during closing arguments. Although the Court began trial by preliminarily instructing the jury that "a TASER is considered a dangerous weapon under the law." Tr. of Jury Trial Vol. I of IX at 10:17-23, ECF No. 274, the Court charged the jury in the final instructions with determining beyond a reasonable doubt that the taser was a dangerous weapon, s*ee e.g.* Tr. of Jury Trial Vol. VII of IX at 55:10-12, ECF No. 280 ("The Government contends a TASER is a dangerous weapon, but you must find beyond a reasonable doubt that it meets that definition."), because Defendants insisted that whether the taser is a dangerous weapon is "an element that has to be proven to the jury," *id.* at 5:16-17.[4] The Government took pains during closing arguments to point out to the jury that it could find the taser was a dangerous weapon by examining the label on the taser that said the taser could cause death or serious injury. *Id.* at 98:20-23 ("And you can see that there is a label (indicating). And this is also in some of the exhibits that are photographs. And on that label, you will see it says that the TASER can cause death or serious injury.").

---

[4] *See Day v. NLO, Inc.*, 798 F. Supp. 1322, 1327 (S.D. Ohio 1992) (finding that the court "cured any possible error in the [preliminary] instruction by correcting it in the final instruction") (citing *Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 906 F.2d 1206, 1212 (8th Cir. 1990) (observing that a single erroneous instruction does not require reversal "if the error was cured by a subsequent instruction or by consideration of the entire charge")).

The Court does not know why Juror #1 decided he needed to go on to the manufacturer's website to find out whether the taser was dangerous. Perhaps he was not paying attention during trial or closing arguments. But his effort was ultimately duplicative and the information he obtained was not new or different than that which he already had.

The Court will not order a new trial based on Juror #1's access of extraneous information, nor his admission to other jurors he had done so.

### C. The Government is not permitted to move for a new trial under Federal Rule of Criminal Procedure 33, and if the Court construes the Government's Motion as Defendant Embly's Motion it is untimely, and, in any event, a new trial is not warranted based on the Court's exclusion of the toxicology report.

The Government moved in its Response for a new trial based on the Court's exclusion of the medical examiner's toxicology report. Resp. at 6-12, ECF No. 305.[5] The Court first explains why the Government is unable to bring such a request; the Court then explains that if the Government were able to do so, or if the Court construes the Government's request as Defendant Embly's request, the motion is untimely; the Court finally explains that even the motion was

[5] The Government is not obligated to bring charges against Defendants Mendoza and Embly should a new trial be granted. *See* Fed. R. of Evid. 48(a) ("The government may, with leave of court, dismiss an indictment, information, or complaint."). At the August 4, 2026, hearing, the Government closed by stating that it did not "want anything today to be understood as saying that the government approves of the conduct of the officers. We do not think this was a model of good policing." Tr. of Hr'g of Aug. 4 at 34:16-19. The Court asked the Government to clarify whether "this wasn't a model of good policing, or this was a policing that violated somebody's civil rights?" *Id.* at 34:25 – 35:2. The Government responded that

> what our office will do, if you were to agree with us and grant a new trial, is it would assign a trial team to [evaluate] what claims can be brought. So I haven't been authorized to say we're going to go forward or not. But I suspect they will evaluate it.

*Id.* at 35:4-8. The Government subsequently moved to dismiss the indictments against Defendants with prejudice under Rule 48(a). Mot. to Dismiss at 6, ECF No. 312.

timely, a new trial is not warranted based on the Court's exclusion of the medical examiner's toxicology report.

**(1) *Federal Rule of Criminal Procedure 33 does not permit the Government to request a new trial, and it does not "stand to reason" that Federal Rule of Criminal Procedure 48(a) permits the Government to request a new trial after obtaining convictions.***

The Government argues that, although "Federal Rule of Criminal Procedure 33 does not appear to authorize it to file a motion for a new trial," it should be able to agree to "a lesser form of requested relief" since it may move for dismissal under Rule 48(a).

Federal Rule of Criminal Procedure 33 permits the court to vacate judgment and grant a new trial "[u]pon the defendant's motion . . . if the interest of justice so requires." Fed. R. Crim. P. 33(a). Federal Rule of Criminal Procedure 48(a) permits the Government, with leave of the court, to "dismiss an indictment, information, or complaint." Fed. R. Crim. P. 48(a). During trial, "[t]he government may not dismiss the prosecution . . . without the defendant's consent." *Id.*

The Government is correct that it may not move for a new trial under Federal Rule of Criminal Procedure 33. Only defendants may move for a new trial under Federal Rule of Criminal Procedure 33. Federal Rule of Criminal Procedure 33 makes no allowance for the Government to request a new trial and the Government cites no authority construing Rule 33 to permit the Government to do so.

Whether Federal Rule of Criminal Procedure 48(a) permits dismissal in these circumstances is currently being briefed by the Government and the Court-appointed amicus curiae. *See* Order Appointing Amicus Curiae, ECF No. 320. Even if the Government may dismiss an indictment at this stage, the Court will not grant a new trial under the Government's logic.

Ground for dismissal may not be sufficiently analogous to the reasoning which supports a new trial to assume the latter is a lesser form of relief of the former.

The Government cannot make a request for a new trial under Rule 33 and may not be able to undertake a new trial under Rule 48(a) if Rule 48(a) does not permit dismissal here.

**(2)** ***Even if the Government could move under Rule 33, the motion is untimely.***

The Government indicates that it would have filed a Rule 33 motion if Rule 33 motions were not restricted to defendants. Resp. at 2, ECF No. 305 ("But Federal Rule of Criminal Procedure 33 does not appear to authorize it to file a motion for a new trial itself.")

Even if that were the case, Federal Rule of Criminal Procedure 33(b)(2) requires that "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." The Government's motion was filed seventeen months after the verdict. It is untimely. The Court will, however, address the Government's arguments for a new trial.

**(3)** ***If the Government can move for a new trial, and the motion is timely, the Court will not grant one because the Court's exclusion of the medical examiner's toxicology report was proper and did not impact the fairness of the trial.***

Assuming arguendo the Government can ask for a new trial, or Defendant Embly's joining of the Government's request transforms it into a Federal Rule of Criminal Procedure 33 motion, Tr. of Hr'g of Aug 4 at 25:21-23 ("I believe at least one defendant, maybe both, have joined our motion, so you could consider it as a defense motion."), the Court finds a new trial is not warranted.

The Government argues that "the Government's decision to seek preclusion of John Doe's drug use and cause of death while simultaneously contesting that he was resisting and suggesting that his medical episode was caused by the tasing is highly likely to result in the reversal of these

convictions." Resp. at 6, ECF No. 305. The Government believes that the Defendants received an unfair trial on all counts and divides its argument into (1) counts one and two and (2) count three.

The Government's arguments about fairness are somewhat difficult to parse because they bleed together. The lack of cited cases, aside from a case confirming that excessive force partly depends on whether a person is resisting and a Seventh Circuit case where the police officer's accurate portrayal of circumstances was at issue due to a lack of video recordings, makes this doubly difficult. Resp. at 7-8, ECF No. 305 (citing *Graham v. Connor*, 490 U.S. 386 (1989); *Palmquist v. Selvik*, 111 F.3d 1332, 1342 (7th Cir. 2011)). If the Government had a single case supporting a new trial in these circumstances it would make it easier for the Court to determine if its arguments had merit. The lack of cases, however, is further indication they do not.

The Government's first argument is that the Court's pretrial Rule 403 balancing test failed to properly consider the probative value and relevance of the toxicology report confirming Doe had methamphetamine in his system to whether Doe resisted arrest. The Government argues the Court should have admitted such information despite valid concerns about unfair prejudice and confusing and misleading the jury.

The Government's second argument is that its arguments at closing were unfair despite the Court's instruction about cause of death, Defendants' lack of objections, and the irrelevance of Doe's death to the charge of deliberate indifference to a serious medical need.

The Court first gives a background on its Rule 403 Order excluding the medical examiner's toxicology report before addressing the Government's count one and two, and count three, arguments.

(a) *The Court excluded the toxicology report from trial based on a Federal Rule of Evidence 403 balancing test before trial.*

Prior to trial, the Government moved to exclude (1) evidence of Doe's prior drug use, (2) the medical examiner's toxicology report showing Doe had methamphetamine in his system during the traffic stop, and (3) the medical examiner's finding that his cause of death was toxic effects of methamphetamine. Mot. in Limine, ECF No. 131. Defendants argued the evidence should be included at trial. Mot. in Limine, ECF No. 139; Resp. to Govt's Mot. in Limine, ECF Nos. 148, 151. The Court summarizes its Order excluding the evidence below.

Civil rights violations for excessive force depend on what the officers knew at the time of the incident. *Connor*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). For instance, it is objectively reasonable to use lethal force when a BB gun appears to officers to be a lethal firearm during an incident. *Mendez v. County of Los Angeles*, 815 F.3d 1178, 1195 (9th Cir. 2016), *vacated and remanded sub nom. County of Los Angeles v. Mendez*, 581 U.S. 420 (2017).

The Government argued that because Defendants were not aware of the report confirming Doe had methamphetamine in his system at the time of arrest, and because the alleged violation and heightened penalty for bodily injury are not related to having methamphetamine in his system, the report confirming the presence of methamphetamine in his system is irrelevant. Order at 3, ECF No. 226. The Government also argued that, since it is not seeking a heightened excessive force penalty for death, and death is not an element of any charged crime, Doe's death and his cause of death as found by the medical examiner are irrelevant. *Id.* The Government argued that even if relevant, the information was of minimal probative value, could prejudice the jury against Doe, could confuse the issues since the information is not probative of any charged element, could

mislead the jury and give them the false impression officers knew Doe was on methamphetamines, and would waste time. *Id.* at 3-4.

Defendant Mendoza argued the information is relevant to show an alternative reason why Doe did not comply with the officers' commands, is an alternative source, rather than tasing, of Doe's serious medical need, and makes it "more probable" that Doe "resisted" officers. *Id.* at 4. Defendant Embly argued the information is relevant to how much force Doe used when resisting officers, and therefore how much force was needed to make him comply, and evidence of Doe's overdose is a "commonsense proxy for just how high on meth [Doe] was." *Id.* at 4-5 (quoting ECF No. 151 at 3-4).

(i) *The toxicology report indicating methamphetamine was in Doe's system at the time of his arrest.*

The Court found the probative value of evidence that Doe had methamphetamine in his system at the time of his death was "substantially outweighed by the risk of prejudice, confusing the issues, and misleading the jury." *Id.* at 6.

Because civil rights cases depend on what the officer or officers know and observe at the time of incident, the Court found the body camera recordings of the incident made "any reason why Doe behaved in a certain way less probative." Order at 6-8, ECF No. 226 (citing *Connor*, 490 U.S. at 396). Without the recordings, the jury might have to surmise how Doe behaved, which would make methamphetamine intoxication more relevant. *See id.* The circumstances in *Palmquist*, for example, apparently did not involve body cameras. *See Palmquist*, 111 F.3d at 1341-42. But here the videos permit the jury to judge Defendants' actions based on what the Defendants knew and observed at the time of the encounter—the jury would gain only minimal benefit from learning something the officers did not know at the time. Order at 6-7, ECF No. 226.

The Court also noted that the recordings do "not show obvious signs of aggressive behavior that could be associated with common assumptions about methamphetamine use," particularly because "Officers were able to place Doe in handcuffs without incident and walk him to a police vehicle." *Id.* at 6. The video showed "Defendants' claims of resistance that necessitated use of force appear to be associated with the challenges of getting Mr. Doe in the vehicle, some thirty minutes after officers initiated interaction with Doe." *Id.*

The Court distinguished *United States v. Tony*, No. 16-CR-2904-MV, 2018 WL 501561 (D.N.M. Jan. 19, 2018), upon which Defendants relied for their arguments. *Id.* In *Tony*, two private citizens fought, resulting in the death of one and murder charges for the other. *Id.* (citing *Tony*, 2018 WL 501561, *3). The only witness was the defendant, who wished to use methamphetamine intoxication to explain why he had to stab the victim twenty-three times and hit him with a rock in self-defense. *See id.* The Court noted that unlike in *Tony*, where there was only the defendant's word about what happened, this arrest was recorded on video from multiple angles, "providing the jury with enough information to determine whether Doe failed to comply with the officers' commands or if his actions were erratic." *Id.*

The Court further found that information about methamphetamine in Doe's body could lure the jury into making assumptions that could form an improper basis for their decision, including that Doe was a bad person or officers knew Doe was using methamphetamines at the time. *Id.* at 7 (citing *United States v. Boutte*, No. 22-2079, 2024 WL 3665536, at *4 (10th Cir. Aug. 6, 2024)). The Court also found the toxicology report would create a high risk of confusing the issues and misleading the jury because intoxication is not related to any of Defendants' charged conduct. *Id.*

The Court was also "not convinced the evidence could overcome foundational or hearsay issues." *Id.* The medical examiner's report could not, on its own, "indicate Doe's intoxication and related behavior at the time of the encounter." *Id.* The Court also noted a jury may infer intoxication based on behavior but cannot infer behavior based on medical tests. *See id.* at 7 n.1 (citing *Tony*, 948 F.3d at 1263-64). The latter requires an expert and Defendants failed to proffer one. *See id.*

The Court also analyzed the probative value of the toxicology report to determine how much strength or resistance Doe exerted while being placed in the police vehicle. The Court found the probative value was minimized by the availability of video recordings and sworn testimony. *Id.* at 8-10. The Court also found the toxicology report could not reliably indicate when the methamphetamine might have acted in Doe's system, i.e., did he ingest it immediately before his encounter or far earlier? *Id.* at 8. The Court found the probative value substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. *Id.*

(ii) *The medical examiner's finding that Doe's death was due to the toxic effects of methamphetamine.*

Next, the Court found the medical examiner's finding that Doe's death was caused by the "toxic effects of methamphetamine" irrelevant to the charges, of minimal probative value, unsupported by expert testimony, and carried a high risk of confusing and misleading the jury.

The Court found that, since death is not an element of any of the charged crimes, nor relevant to the Government's case in chief, it could only be relevant to a defense, *id.* at 10, but the cause of Doe's death had little to no probative value to the Defendants' cases-in-chief, *id.* at 11.

The Court found Defendant Embly's argument that Doe's cause of death was a proxy for Doe's level of intoxication during arrest unavailing. First, there is no indication that Doe died from

an acute overdose, meaning taking a large quantity of methamphetamines in a short time, or a chronic overdose, meaning the cumulative effect of long-term use, and therefore no conclusion could be drawn about the effect of his overdose on his behavior while alive. *Id.* at 10-11.[6] Nor, as noted above, could the report indicate when Doe had consumed the drug, and therefore it could not bear on his level of intoxication during his arrest. *Id.* at 11.

Furthermore, the Court found that even if the report on Doe's death could provide some probative value, there was no expert available to link the report to Doe's behavior. *Id.* at 12. The medical examiner was not qualified to do so, *id.* at 11-12, and Defendant's notice of her expert testimony raised Federal Rule of Criminal Procedure 16(b) discovery issues and Federal Rule of Criminal Procedure 16(b)(1)(C) issues, *id.* at 12 n.4, creating foundational issues for the report, *id.* at 12 n.5.

The Court further found that the cause of Doe's death would create a high risk of confusing and misleading the jury by raising many "what if" questions. *Id.* at 11-12. The Court prohibited the cause of death from being admitted as evidence "unless facts presented at trial change the Court's weighing of factors . . . [i]n which case, parties shall make any related motions for objections at bench." *Id.* at 12.

The Court did find, however, that including the fact of Doe's death without telling the jury how he died could be prejudicial against Defendants. *Id.* The Court therefore agreed to minimize prejudice by including a limiting jury instruction that "states that the jury cannot infer Defendants'

[6] The medical examiner, in fact, appeared to default to overdose rather than "electric shocking" because there was methamphetamine in Doe's system and "footage clearly shows that [Doe] was alive for over 10 minutes after being placed alone in the police vehicle." *Id.* (citing Medical Examiner's Report at 3, ECF No. 139-3). The medical examiner did not indicate whether, if Doe had died within 10 minutes after being placed in the vehicle, his death might have been attributed to "electric shocking" instead. *See generally* ECF No. 139-3.

guilt from the fact that John Doe later died." *Id.* (citing *United States v. Martinez*, 92 F.4th 1213, 1249 (10th Cir. 2024)).

(iii) *Evidence of past drug use.*

The Court also addressed Defendant Embly's request to introduce evidence of Doe's past drug use. The Court found transcripts of an FBI interview of Doe's family members and a New Mexico state police interview with Doe's ex-wife had little to no probative value, and the value they did have was substantially outweighed by the risk of unfair prejudice, confusing the issues, misleading the jury, wasting time, and needlessly presenting cumulative evidence. *Id.* at 15-16. The Court excluded the medical examiner's toxicology report for the same reasons the results of the report were inadmissible. *Id.* at 16. The Court excluded medical records of treatment received by Doe for stimulant abuse and intoxication prior to his arrest as non-probative, because the only indication of intoxication was a statement from Doe's mother to the doctor and Defendant Embly provided no foundation. *Id.* at 16-17, 17 n.7. The Court excluded two search warrants issued after Doe's death, finding them irrelevant to the charges at issue and likely to be a fishing expedition to justify the officers' actions after the fact. *Id.* at 17. The Court found that even if they had some minimal probative value, it would be substantially outweighed by the risks of unfair prejudice, confusing the issues, misleading the jury, and wasting time. *Id.*

The Court now turns to the Governments' arguments.

(b) *The Government cannot argue the Court committed error when it adopted the Government's proposition in its Rule 403 Order.*

The Court finds the Government's argument that the Court erred in its Rule 403 Order fails under the doctrine of invited error. "Generally, 'the invited-error doctrine precludes a party from

arguing that the district court erred in adopting a proposition that the party had urged the district court to adopt.'" *United States v. McBride*, 94 F.4th 1036, 1041 (10th Cir. 2024) (citation omitted). "A party who 'induces an erroneous ruling' from the district court may not then seek sanctuary from the consequences of that ruling through an appeal." *Id.*

The Government states that, in arguing that the Court should exclude the evidence under Federal Rule of Evidence 403, "it induced this Court to commit an abuse of discretion that deprived Defendants of a fair trial." Resp. at 7, ECF No. 305. Under the doctrine of invited error, the Government is precluded from arguing the Court erred in adopting its proposition. *McBride*, 94 F.4th at 1041.

Assuming, however, that the doctrine of invited error does not apply, the Court proceeds with its analysis.

(c) *The Court finds Defendants received a fair trial on excessive force and failure to intervene.*

The Government argues that Defendants did not receive a fair trial on counts one and two because the Court's Rule 403 order excluding the medical examiner's toxicology report was "an abuse of discretion." Resp. at 7, ECF No. 305.

The Government argues Doe's "methamphetamine use was relevant on the issue of whether the officers' use of force was unreasonable" because if "Doe was high on methamphetamine, that would tend to make it more likely that he was acting erratically, irrationally, and was resisting arrest." *Id.* The Government provides no citation for that assertion. The Government cites *Connor*, 490 U.S. at 386, but only for the principle that "whether a defendant

is actively resisting or not is one of the principal factors to be used in determining whether a police officer used excessive force." *Id.*[7]

The Government also argues the Court "did not properly evaluate the probative value or relevance of the evidence" because (1) the body camera footage does not "clearly show whether John Doe was resisting . . . or to what extent he was doing so," *id.* at 8; (2) "a reasonable jury could infer [Doe] was likely impaired by the drug during the 45-59 minute period immediate preceding his death, based on both the strange behavior he exhibited before his arrest and his ingestion of a quantity of methamphetamine sufficient to *kill* him by the end of that period," *id.*; (3) "evidence that an arrestee was intoxicated is nevertheless relevant to an excessive-force claim to show how the individual interacted with police officers and whether their use of force was reasonable," *id.* (citing *Palmquist*, 111 F.3d at 1342 for the principle that "evidence of an arrestee's intoxication is admissible under Rule 403 in excessive-force case because it 'tends to make more probable that the [arrestee] acted as the [police officer] contended he did . . . .'"); and (4) "the Government's own evidence and arguments during the trial increased the probative value of John Doe's methamphetamine use" because it "repeatedly argued and suggested that Doe was not actually impaired and was not resisting arrest," thereby eliciting "sympathetic justifications for [Doe's] behavior" and put "his true condition directly at issue," *id.* at 8-9.

The Government acknowledges there is "some danger of unfair prejudice" but "does not believe that such danger substantially outweighs" the probative value of the toxicology report "on the question of Doe's resistance, given the prosecution's efforts at trial to persuade the jury that Doe was not resisting arrest." *Id.* at 9.

---

[7] The Government fails to provide a pincite, but the Court believes it attempts to cite to *Connor*, 490 U.S. at 396.

For purpose of analysis, the Court divides the Government's arguments into two categories: arguments about the Court's 403 decision prior to trial and arguments about the conduct at trial.

(i) *Prior to trial.*

As to the former, the Government largely rehashes positions taken by Defendants in their responses to the Government's Motion in Limine and Defendant Embly's Motion in Limine. Those positions were addressed by the Court in its Order of February 4, 2026. ECF No. 226. Nevertheless, the Court addresses each here.

Before beginning, the Court notes that *all* the Government's arguments are about the relevance and probative value of the toxicology report and *none* of its arguments substantively address whether the probative value is substantially outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See generally* Resp., ECF No. 305; *id.* at 10 ("The Government acknowledges, as this Court found, that the evidence of Doe's use of illegal drugs does present some danger of unfair prejudice, but it does not believe that such danger substantially outweighs its probative value on the question of Doe's resistance."); Fed. R Evid. 403. The Government addressed the issue in a similarly cursory manner at the hearing. Tr. of Hr'g of Aug 4, 2026 at 21:3-14 ("And the potential . . . for unfair prejudice has to be substantially in excess of the probative value, and we just don't think we were correct to argue that the prejudicial value, which was there in any case, where someone is—where it's revealed that someone has been taking illegal drugs like methamphetamine. I agree there was some prejudicial potential for prejudice there, but

where one of the central issues in the case is whether he was resisting, we don't think that we can argue that the—that potential for unfair prejudice substantially exceeded its probative value.").

First, the Government claims that the toxicology report was relevant because the body camera footage does not "clearly show" that Doe was resisting or to what extent he was doing so. Resp. at 8, ECF No. 305. In its Order, the Court did not find that the report was irrelevant, nor that the video recordings clearly show the extent of his resistance. ECF No. 226 at 6-7. The Court found that the toxicology report confirming methamphetamine was in his system at the time of arrest was less relevant because the jury could observe his behavior on the video. *Id.* at 6-7. The Court concluded that this diminished relevance was outweighed substantially by misleading and confusing the jury, especially because the jury would be concerned only with what Defendants knew at the time of the encounter and Defendants did not know a toxicology report after Doe's death would confirm the presence of methamphetamine in his system. *Id.* at 7-8.

The Court even spelled out in a subsequent clarifying order that "its ruling on evidence of John Doe's contemporaneous drug use did not exclude evidence in the form of testimony from Defendants or their witnesses regarding their observations or impressions as to John Doe's behavior or any conclusions that they drew, including perceived intoxication." ECF No. 228. Defendants did so, introducing evidence the police canine alerted on Doe's truck, *e.g.,* Tr. of Jury Trial Vol. III of IX at 184:15-17, ECF No. 276, evidence Doe was unable to recall the date or the President's name, *id.* at 183:9-11, and evidence Doe's erratic driving precipitated the arrest, Tr. of Jury Trial Vol II of IX at 153:19-22, ECF No. 275. Defendants cross examined an expert witness about the signs of intoxication and applied them to the video records. Tr. of Jury Trial Vol. IV of IX at 282:7 – 298:23, ECF No. 277. The jury heard that the officers administered Narcan to Doe and Narcan is intended to counteract opioid overdoes. Tr. of Jury Trial Vol II of IX at 135:9-13,

ECF No. 275. The jury heard statements in the body camera videos indicating officers believed Doe was intoxicated, *see* Tr. of Vol. III of IX at 113:24 – 114:11, ECF No. 276, but did not smell alcohol, *id.* at 114:12-15. And Defendant Embly's counsel asked an expert witness if that "leaves the inference or conclusion that [Doe] may have been under the influence of some other substance like a narcotic that was causing him the symptoms of intoxication, correct?" *Id.* at 114:16-19. Defendants choose not to testify or to bring in an expert witness on behavior that indicates a person is intoxicated by methamphetamines.

In sum, as the Court intended in its Rule 403 Order, the jury heard all about what was relevant: what the officers perceived and believed at the time of the arrest. The jury did not hear about what was less relevant—the fact that the medical examiner's report found there was methamphetamine in Doe's system—because its probative value was significantly outweighed by the risk of unfair prejudice and confusing and misleading the jury. The Court finds its Rule 403 analysis was correct and Defendants were free to put on a robust defense that was not unfairly limited.

The Government's second argument is that "a reasonable jury could infer [Doe] was likely impaired by the drug during the 45-59 minute period immediately preceding his death, based on both the strange behavior he exhibited before his arrest and his ingestion of a quantity of methamphetamine sufficient to *kill* him by the end of that period." Resp. at 8, ECF No. 305.[8]

The argument exemplifies why the Court excluded the toxicology report. Since a jury could "infer [Doe] was likely impaired by the drug during the 45-59 minute period immediate preceding his death, based on . . . the strange behavior he exhibited before his arrest," *id.*, which was

---

[8] It appears to rehash Defendant Embly's argument that "Doe's 'meth intoxication [was] so high that he killed himself from it'" is relevant because it serves as a "commonsense proxy for just how high on meth he was." Order at 5, ECF No. 226 (citing Def. Embly's Resp. at 3-4, ECF No. 151).

recounted during trial, *see e.g.,* Tr. of Jury Trial Vol. V of IX at 280:6-10 ("A. I noticed him driving around the pumps numerous times. He stopped at a pump, never got out, and then continued to do circles. Q. And you thought that was kind of odd, didn't you? A. I did, yes, sir."), the jury had less need to consider Doe's "ingestion of . . . methamphetamine," Resp. at 8, ECF No. 305, making Doe's methamphetamine ingestion less relevant and less probative of his behavior. The Court has already addressed why the report is minimally probative of Doe's behavior. *Supra* III.C.3.a.ii.

The Government's third argument is that "evidence that an arrestee was intoxicated is nevertheless relevant to an excessive-force claim to [1] show how the individual interacted with police officers and [2] whether their use of force was reasonable." Resp. at 8, ECF No. 305. The Government cites *Palmquist*, 111 F.3d at 1342, for the principle that "evidence of an arrestee's intoxication is admissible under Rule 403 in excessive-force case because it 'tends to make more probable that the [arrestee] acted as the [police officer] contended he did . . . .'" *Id.* As covered previously, the circumstances in *Palmquist* apparently did not involve body cameras. *See Palmquist*, 111 F.3d at 1341-42.

And as with evidence about Doe's resistance, the Court found the toxicology report confirming Doe had methamphetamine in his system relevant and probative to how he interacted with police but less probative due to other available evidence, *see* Order at 6, ECF No. 226 ("[S]ubstantial video evidence exists from multiple angles and viewpoints, providing the jury with enough information to determine whether Doe failed to comply with the officers' commands or if his actions were erratic—which makes any reason why Doe behaved in a certain way less probative."), and substantially outweighed by other factors, *id.* at 7. Similarly, the Court found the toxicology report relevant and probative to whether use of force was reasonable but less probative due to the availability of other evidence, *id.* at 6-7 ("[T]he jury has plenty of evidence before it, in

the form of video recordings (and possibly witness testimony), to determine how much force was necessary in the situation, making whether Doe had drugs in his system at the time less probative."), and again substantially outweighed by other factors, *id.* at 7.

Resistance and reasonable force were openly contested at trial and Defendants introduced evidence and testimony on the subject. The two sides argued what constituted active resistance, Tr. of Jury Trial Vol. III at 110:23 – 111:4, ECF No. 276 ("Q. How about pushing a door to a police car open with their feet? A. Again, depending on the scenario. If you're referring back to this scenario, if a subject has been placed under arrest, been ordered that he is under arrest, he's being escorted and he's kicking, as you referred to, I would consider that possibly as active resistance."), and whether Doe continued to resist during the entire encounter, Tr. of Jury Trial Vol. IV of IX at 322:6-12, ECF No. 277 ("Q. And when they get to the other vehicle, the other vehicle doesn't have the dog cage or any of those things in it, right? A. Correct. Q. But [Doe] still resisted, didn't he? A. I couldn't tell that, sir, based on that angle of the camera. It was verbalized, but I couldn't tell that."); Tr. of Jury Trial Vol. V of IX at 135:23 – 136:1, ECF No. 278 ("In this arrest, the officers, they struggled getting handcuffs on him; do you remember that part? A. I remember that they were saying, 'Stop, stop resisting' while they were trying to apply the handcuffs."). The jury watched the encounter and heard the officers order Doe to stop resisting in the body camera footage. *See* Tr. of Jury Trial Vol. IV at 263:13-15, ECF No. 277. Defendant Embly's counsel asked an expert witness whether "someone who is under the influence of narcotics can often be stronger or have more strength than the average person?" and the expert answered, "I would agree with that statement." Tr. of Jury Trial Vol. III of IX at 117:19-21, ECF No. 276.

The Court's Rule 403 decision did not exclude evidence of resistance, nor did it prevent the jury from inferring that Doe was resisting because he was intoxicated by drugs or alcohol, nor did it prevent Defense from bringing in an expert on what Doe's actions may have indicated about the type of narcotic he was on, nor did it prevent the officers from testifying about whether they thought Doe was on methamphetamines—it merely excluded the evidence that Doe had methamphetamines in his system, a fact which officers did not know at the time.

(ii) *During trial.*

The Government's fourth argument is that its "evidence and arguments during the trial increased the probative value of John Doe's methamphetamine use" and put "his true condition directly at issue." Resp. at 8-9, ECF No. 305.

The Government must mean that at some point during trial the Court should have either (1) sua sponte stopped the Government from making arguments that put Doe's condition at issue or (2) sustained an objection from Defendants about the introduction of the toxicology report. The Court assumes it cannot be the former because it is the opposing party's responsibility to object during trial. The Court pointed this out in its Order: "John Doe's alleged intoxication may not be admitted as evidence unless facts presented at trial change the Court's weighing of factors. In which case, parties shall make any related motions or objections at bench," ECF No. 226 at 9-10, and at trial, "if somebody on either side thinks that the other side has opened the door to some testimony that I ruled inadmissible at pretrial, you are to approach and we'll discuss that first," Tr. of Jury Trial Vol. II of IX at 203:9-12, ECF No. 275. The Court also reminded the Parties before closing arguments that "anybody can object at any time about anything." Tr. of Jury Trial Vol. VI of IX at 301:22, ECF No. 283.

The Court therefore assumes that the Government believes the Court should have sustained an objection made by Defendant about opening the door to the toxicology report. The Government does not point to any specific instance during the trial when it suggests the Court should have done so, but the Court will review the objections.

First, during Defendant Embly's counsel's cross examination of Special Agent De Los Santos, counsel asked if, since Officer Saffell stated the officers did not smell any alcohol, that "leaves the inference or the conclusion that he, [Doe], may have been under the influence of some other substance a narcotic that was causing him the symptoms of intoxication, correct?" Tr. of Jury Trial Vol. III of IX at 114:16 – 19, ECF No. 276. Special Agent De Los Santos replied "Not necessarily, sir. In these situations, there's two other options. And I'll explain those two other options for you if you would like me to." *Id.* at 114:20-22. Counsel said "Sure." *Id.* at 114:23. Special Agent De Los Santos then testified that a person "suffering from a diabetic episode" or someone "that is an epileptic" would display similar behavior. *Id.* at 114:24 – 115:14.

Defendant Embly's counsel then approached the Court:

> [DEFENDANT EMBLY'S COUNSEL]: I think Agent De Los Santos, in going off on all of these possibilities that he knows is not the case here and trying to put that in front of the jury, opens the door to what the case actually is, which is methamphetamine use.
>
> THE COURT: All right. I mean, you asked him.
>
> [DEFENDANT EMBLY'S COUNSEL]: Sure, but I didn't ask him to claim that it was a diabetic . . .
>
> THE COURT: If he had claimed those things, maybe, but he just said those were other things that might cause someone to act that way that wasn't intoxication.
>
> [DEFENDANT EMBLY'S COUNSEL]: Can I at least ask him that we know it was not diabetes in this and that we know that it was not—
>
> THE COURT: No. We don't know those things.

> [DEFENDANT EMBLY'S OTHER COUNSEL]: Sure, we do.
>
> THE COURT: What do you mean?
>
> [DEFENDANT EMBLY'S COUNSEL]: We have the autopsy with all the results. He didn't have high—they didn't say he had high blood sugar. They say he died of a methamphetamine overdose.
>
> THE COURT: I don't find that it opened the door. I don't think that the autopsy shows conclusively he didn't have those things—I'll go back and look at it, but that he didn't have those things. We can talk about it more later, but for now, no.

*Id.* at 115:19 – 116:18.

The Court's analysis remains the same. A medical report on the cause of death does not bear on other medical conditions that may have caused behavior. That Defendant Embly's counsel invited Special Agent De Los Santos to speculate on other reasons Doe may have behaved in that manner did not open the door to the toxicology report.[9]

Second, during the Government's examination of Detective Edwin Garcia of the New Mexico State Police, who investigated Doe's death at the Jal Police Department, *see id.* at 171:6-17, Defendant Embly's counsel objected to the Government asking if Detective Garcia obtained "a search warrant to search [Doe's] truck," *id.* at 188:24-25. Defendant Embly's counsel objected to the relevance of the warrant and the objects found, including a Tic Tac box. *Id.* at 189:6-12. Counsel argued that if the Government was trying to show that there were no drugs found in Doe's vehicle, Defendants should be able to rebut that with the autopsy report showing evidence of drugs in Doe's body. *Id.* at 190:20-24. The Court asked how the autopsy report shows there were drugs

---

9 Nor has any party cited a case permitting a party to open the door for themselves by cross-examining a witness.

in the vehicle, *id.* at 190:25 – 191:1, and Defendant replied that "The implication is that he was using drugs," *id.* at 191:2-3.

The Government clarified that it

> would not have asked about the Tic Tac box [except] [Defendant Mendoza's counsel] had said yesterday he wanted that in . . . and my next question . . . about the search warrant, based on him saying yesterday that he wanted that in, it's going to leave a false impression in the jury's mind if they don't get to hear an answer on that.

*Id.* at 191:19-25. The Court said "I'll consider all of that. Ask other questions and I'll come back to it." *Id.* at 192:1-2. The Government did not return to the warrant or the Tic Tac box and passed the witness. *See id.* at 192:6 – 193:10.

After a Government objection during cross-examination the Court continued the discussion. *See id.* at 200:16-22. The Court sustained Defendant Mendoza's "objection to the results of the warrant as not being relevant," *id.* at 205:15-18, the Government requested that Defendants not ask any questions on cross examination about the Tic Tac box, *id.* at 205:20-23, and Defendants agreed, *id.* at 205:24 – 206:3. Defendants did not bring up whether the testimony opened the door. *See id.* The Court does not find the exchange about the warrant and Tic Tac box should have opened the door to the toxicology report or that the Court erred in continuing to exclude the toxicology report.

Third, after the Government concluded its redirect examination of Ms. Jenna Chavez about her confirmation after the incident that John Doe's photograph appears in the driver's license he gave to officers during the traffic stop, *see* Tr. of Jury Trial Vol. V of IX at 82:20 – 84:22, 86:20 – 87:21, ECF No. 278, Defendant Embly's counsel argued that because

> the Government just presented a witness to put before the jury facts that were purely determined after the incident . . . we believe that this opens the door, Your Honor,

> to allow us to also put on facts that were known only after the incident, such as the methamphetamine use.

*id.* at 88:3-8. The Court told the parties she would talk it about at the next break. *Id.* at 88:14.

On the next break, the Court told Defendants that she would have sustained an objection about evidence verifying the driver's license because that information was not available to the officers at the time of the arrest, but that the Government's introduction of the evidence did not open the door to the toxicology report:

> [DEFENDANT EMBLY'S COUNSEL]: Your Honor, do you want to address the issue we raised about opening the door?
>
> THE COURT: The—yes. I mean, I probably would have sustained an objection if you'd made it. Which I understand people don't make objections for all kinds of reasons, but I don't think it—but you didn't. And I don't think it opened the door to the toxicology report. Which is what you're wanting, right?
>
> [DEFENDANT EMBLY'S COUNSEL]: Or us being able to bring in [the medical examiner], yeah.
>
> THE COURT: Say it again.
>
> [DEFENDANT EMBLY'S COUNSEL]: To bring in [the medical examiner], yes.
>
> THE COURT: It opened the door to stuff you were doing with the driver's license for sure that was found out after, so you got something on that. It probably did open the door to what people knew about the driver's—actually, opened the door to what people knew about the driver's license afterwards, but I'm not going to find it opened the door to anything else.

*Id.* at 166:11 – 167:4. The Court does not find the Government's evidence about verifying the driver's license after the incident should have opened the door to toxicology report or that the Court erred in continuing to exclude the report.

Fourth, also during that break, the Court discussed with the parties whether an instruction would be given about the missing toxicology report. Defendants proposed adding an instruction stating, "because neither the Government nor the defendants are entitled to rely on evidence that

was only available after the fact, you will not receive any evidence about any toxicology reports." *Id.* at 163:19-22. The Government proposed the instruction eliminate the reference to entitlement to rely on evidence available after the fact. *Id.* at 163:23 – 164:8. Defendants stated "our first preference is no instruction be given on this, which is the case for all kinds of evidence that is excluded in this case or any other." *Id.* at 164:12-14. The Court decided not to give the toxicology instruction. Tr. of Jury Trial Vol. VII of IX at 18:6-8, ECF No. 280. The Court finds that was correct and in accordance with Defendants' position.

Fifth, during expert testimony an expert stated, "[a]nd for Taser, it's recommended that you monitor them for 20 minutes after the exposure." Tr. of Jury Trial Vol. VI of IX at 205:5-6, ECF No. 283. A second expert stated that Doe was "behaving off," looked "extremely tired," and said she recalled the testimony of another witness who stated a person who has not slept for 24 hours may behave like someone with a blood alcohol content of 0.10. *Id.* at 241:9-19.

Defendant Embly's counsel objected to the second expert's testimony and the Court ordered the Government to "move on from this line of questioning" to prevent an "implication that there was no level of substance in [Doe's] blood." *Id.* at 241:24 – 243:6.

At the conclusion of the Government's case, before Defendants began their cases-in-chief, Defendant Embly's counsel stated that he believed testimony about Doe looking tired combined with expert testimony about the "need to observe someone for 20 minutes after they're tased to make sure something doesn't go wrong," opened the door to the medical examiner's opinion that medical incidents from tasing are instantaneous, meaning testimony indicating Doe did not die from tasing. *Id.* at 294:19 – 295:5. The Government stated that the expert testified the 20-minute observation was "a recommendation . . . that applies if they're using pepper spray," not a need, and did not understand why that would open the door. *Id.* at 295:15-18. The Court stated that it

believed the Government was "probably right" but that the Court would "look at it" and let the Parties know. *Id.* at 295:21-23.

Defendant Embly's counsel then stated that, as to the tiredness, although the Court "did sustain a defense objection, . . . that directly implies to the jury something that's incredibly misleading, which is that he's just tired. And we know that that's not true. And other than that, . . . if we can't call [the medical examiner], we don't have any witnesses." *Id.* at 296:9-14. The Court replied that

> I do think—I mean, I do have some concerns about the tired—so tired that you . . . act as if you're a .10 BAC, but I'm not going to find that it opened the door. I have other concerns about the [medical examiner's toxicology] report having to do with all the things I went over in my pretrial ruling. So I don't think that the defense has what it needs to say [Doe] was behaving strangely because he was under the influence of methamphetamine. And I don't want to say it all again because I already did it.

*Id.* at 296:16-24.

The Court does not find the Government's evidence about Doe's tiredness should have opened the door to the toxicology report or that the Court erred in continuing to exclude the report. Defendants Mendoza and Embly were free to testify about their impressions of Doe's actions, whether they were caused by exhaustion or suspected intoxication, and Defendants were free to bring expert testimony about whether Doe's behavior indicated he was intoxicated rather than tired.

The Court did not address whether the expert testimony about the 20-minute monitoring period opened the door during trial. *See generally* Tr. of Jury Trial Vols. VI – IX of IX, ECF Nos. 280-83. Upon review, however, the Court finds that the expert's testimony did not open the door to testimony from the medical examiner. First, the medical examiner's report addressed a different topic than the expert and therefore cannot be used to contradict the expert. The expert testified

about monitoring people for 20 minutes after tasing. Tr. of Jury Trial Vol. VI of IX at 205:5-6, ECF No. 283. The medical examiner did not state in her report that "medical incidents are instantaneous," as represented by Defendant Embly's counsel, *id.* at 294: 25 – 295:4 ("I think that that opens the door, you know, to us being able to present the opinion of [the medical examiner] that when there are medical incidents, you know, that occur from the tasing, that those are instantaneous, that they don't occur 10 minutes, 20 minutes later."), she wrote that "There are reports of sudden death associated with stimulant abuse and the use of stunning devices . . . [but sudden deaths are] usually related to likely sudden cardiac arrhythmias, or abnormal heart rhythms and occur immediately after the shock is administered." ECF No. 139-3 at 3. Since she did not address medical incidents generally she cannot refute the expert's recommendation that people tased be monitored by law enforcement for 20 minutes for any medical needs.

Second, the report only relayed information about "reports of sudden death associated with stimulant abuse and the use of stunning devices" read by the medical examiner. *Id.* Reading reports about deaths resulting from stunning devices does not qualify the medical examiner to testify as an expert about post-tasing medical care or responsibility by law enforcement. The Court does not find the expert testimony should have opened the door to the medical examiner's report or that the Court erred in continuing to exclude the medical examiner's report.

The Court finds nothing in the trial record that indicates it erred in ruling on objections related to the toxicology report. Defendants received a fair trial on counts one and two and the Court will not declare a mistrial on either count.

(d) *Defendants did not receive an unfair trial on deliberate indifference to a serious medical need.*

The Government argues that both Defendants Mendoza and Embly received an unfair trial on the charge of deliberate indifference to a serious medical need because of "the exclusion of evidence that a methamphetamine overdose caused Doe's death combined with arguments made by the prosecution." Resp. at 10, ECF No. 305. The Government argues that the effect of the Court's instruction "that Defendants were not charged with causing Doe's death, that the Government was not alleging that the tasings caused Doe to die, that the jury should not infer guilt on Count 3 from the fact that Doe died, and that Doe's death was entirely irrelevant to the jury's decision and should not be considered" was "undermined by the Government's own closing and rebuttal arguments." *Id.* at 10-11. The Government "lacks confidence that the trial on Count 3 was a fair one, and it therefore believes that Defendants should receive a new trial on it as well." *Id.* at 12.

Although the Government concedes it "presented no evidence that the tasing caused or contributed to Doe's serious medical condition or his resulting death," the Government believes its "arguments suggested that such a causal connection existed" because, in closing, the prosecutor argued "that a reasonable person would think that Doe was experiencing a serious medical need because he had been tased 14 times;" that "officers intentionally delayed medical care by not calling EMS immediately after tasing him 14 times;" that "Embly and Mendoza had been trained that multiple Taser uses require medical attention;" and, in rebuttal to "a defense argument that the officers didn't realize that Doe's condition was grave and probably thought that he was intoxicated and was just sleeping it off," argued that "unlike ordinary people who are intoxicated, Doe had been tased 14 times." *Id.* at 11 (citing Tr. of Jury Trial Vol. VII of IX at 121-22, 126-29, 225-26, ECF No. 280). The Government acknowledges that Defendants did not object to these arguments. *Id.*

The Government does not argue that the Court erred in excluding the cause of death as to the charge of deliberate indifference to a serious medical need before trial with any specificity, *see generally* Resp. at 10-12, ECF No. 305, therefore the Court will not readdress its Order.

Although the Government argues only about the effect of its closing argument on the fairness of the trial, *see generally* Resp. at 10-12, ECF No. 305, the Court finds it is worth reviewing cause of death objections made during trial before turning to the closing arguments.

(i) *During trial, before closing arguments.*

First, at the conclusion of the first day of trial the Government moved to admit photos of Doe's body after his death. Tr. of Jury Trial Vol. I at 97:21 – 98:4, ECF No. 274. Defendant Embly's counsel objected, and the Court excused the jury before addressing the objection. *Id.* at 98:6 – 99:4. Counsel argued the photos created a prejudicial concern "when the defense is prohibited from telling the jury why [Doe] died and why they are looking at a dead body." *Id.* at 99:22-23. Counsel also stated he believed there would be a "confusing-the-issues problem" and an "inflaming the jury" problem because Doe died in custody. *Id.* at 100:22 – 101:2. Defendant Mendoza's counsel argued that the photos are misleading since the Government mentioned tasing before showing the photos. *Id.* at 101:12-20. The Government argued that "all of the other evidence in this case is replete with references to the fact that [Doe] died" including interviews with both Defendants. *Id.* at 104:2-6.

The Court overruled the objection, finding the photographs "highly probative of the injuries the decedent suffered" and that the probative value substantially outweighed other concerns, "especially given [the Court] offered a limiting instruction" and "gave a detailed order about my concerns about alleged drug use and cause of death." *Id.* at 104:10-19.

The Court finds it did not err in finding introduction of the photographs did not open the door to introducing the cause of death.

Second, prior to examining FBI Special Agent De Los Santos, the Government verified with the Court that by asking Special Agent De Los Santos about Narcan, which the officers administered to Doe, the Government was not opening the door to the actual cause of death. Tr. of Jury Trial Vol. I of IX at 105:1-8, ECF No. 274. Defendant Embly's counsel confirmed that he agreed, and Defendant Mendoza's counsel declined to address it, which the Court understood as agreement. *Id.* at 105:9-20.

The next day, after the Narcan testimony, Tr. of Jury Trial Vol. II of IX at 135:9-15, ECF No. 275, Defendant Mendoza's counsel asked Special Agent De Los Santos, "And you know well the cause of death in this matter was not the TASER?" *Id.* at 146:9-10. The Government objected and the Court held a bench conference. *Id.* at 146:11-14. The Government stated that it did not know why Defendant's counsel was asking about the cause of death. *Id.* at 146:15-16. Defendant Mendoza's counsel said that he believed the Government had "opened the door wide open" to discuss Doe's cause of death. *Id.* at 146:19.

Defendant Mendoza's counsel argued

> my rationale was I'm not introducing the drug stuff, right? I'm not introducing any of that. What I'm doing is I'm explaining what it wasn't. So the reality is I'm not saying what the cause of death was, I'm saying what the cause of death wasn't.

*Id.* at 146:25 – 127:4. The Court stated it would review its Order to determine whether the Order prohibited everything about the cause of death or prohibited evidence that the cause of death was methamphetamine overdose. *See id.* at 147:5-19. The Order states, "John Doe's cause of death may not be admitted as evidence," indicating the latter. ECF No. 226 at 12.

The discussion between the Court and the parties continued:

> [DEFENDANT MENDOZA'S COUNSEL]: . . . my specific question is going to be on Maalox [sic]. He testified—there's a lot of evidence about Maalox and Maalox does not work on methamphetamine and everybody knows it. I would like to inquire into that.
>
> THE COURT: Why?
>
> [DEFENDANT EMBLY'S COUNSEL]: Because the inference, Your Honor, when they say that, is—they gave him Maalox—
>
> [GOVERNMENT]: It's Narcan.
>
> [DEFENDANT MENDOZA'S COUNSEL]: I'm sorry, Narcan. I think it's the same thing.[10] They're saying that they gave them these things, right? And it still didn't help. And the next inference there is that, okay, the cause of death was something else other than drug-related. When you think about it—
>
> THE COURT: It's not opioid-related.
>
> [DEFENDANT MENDOZA'S COUNSEL]: That's right. And the thing is methamphetamine is not an opioid.
>
> THE COURT: The methamphetamine is . . . out. I mean, I issued a long written order on this before.
>
> [DEFENDANT MENDOZA'S COUNSEL]: That's why I'm bringing it up now. I think they have absolutely opened the door to this, Judge, by bringing in the Maalox, first of all.

Tr. of Jury Trial Vol. II of IX at 147:23 – 148:19, ECF No. 275. When asked if he had any other arguments about the Government opening the door to discuss the cause of Doe's death, Defendant Mendoza's counsel then stated that "The whole fact that they have set this whole case up to lead to the inference that this man died, and there's no —you're going to give that limiting instruction about 'don't consider it,' but the jury is going to infer that [Doe died from tasing]." *Id.* at 148:21-25. He also stated that

> when [Special Agent De Los Santos] gave his expert opinion, with no medical training, about being in distress and all of these things, I think that opens the door

10 It is not.

> to a lot of things. He talked on his direct examination about that, even though he said he didn't have medical training. And I didn't object for this reason, but he talked about medical distress in this case.

*Id.* at 149:2-8. Defendant Embly's counsel added that

> The disclosure just said that he was going to testify that he would get medical care for someone who was tased 14 times, and he went far beyond that. And the Government not only asked him, after that, when he was in the back, you know, what his impression was, and he said that he believed he was in medical distress and why. And he said that he believed he was in respiratory distress, right? So he's now—the Government's now offering evidence to the jury about a medical condition that is allegedly affecting this man. There's no—the evidence is that the medical condition affecting him is he's overdosing.

*Id.* at 149:19 – 150:4. The Court corrected Defendant Embly's counsel that the evidence did not confirm that Doe was overdosing at the time of his arrest and found the Government had not opened the door. *Id.* at 150:5-6. The Court instructed the Government not to "ask any questions about methamphetamine or some kind of negative inference on methamphetamine." *Id.* at 150:6-8.

At the conclusion of that day, the Court stated that, although the Order did not prohibit the Parties from discussing "things that did not cause John Doe's death," the Court was concerned

> about having a case agent just get on the stand and say the autopsy found that John Doe's death was caused by something else . . . I'm not sure that that's even appropriate for an agent to do. . . . [I]t's going to show that there's an autopsy report and it's going cause the jurors to speculate about it. We don't have the medical examiner here to say that. We just have an agent saying what's on a report that he read. . . . [I]t's going to cause the jury to speculate.
>
> . . . I don't think it's probative because he's not charged—the officers aren't charged with causing John Doe's death. So I don't think it's relevant. And I do think any potential relevance that it had is outweighed by confusing the issues, misleading the jury, and asking them to speculate because then they'd know that there's an autopsy and a report that says something about it.

*Id.* at 202:15 – 203:7.

The Court asked if any Parties had questions, Defendant Embly's counsel asked if "Can we exclude the possibility that the TASER caused the death and just not bring in the fact that he died of drugs?" since the medical examiner's report found the tasing did not cause Doe's death. *Id.* at 204:13-15. After listening to argument from Defendant Embly and Mendoza's counsel, the Court stated that it would issue a limiting instruction telling the jury not to consider cause of death because the Court did not

> want speculation from the jury on what caused the death . . .[the Court did] not want to mislead them . . . [and the Court did] not want to confuse the issues because the cause of death just isn't an issue in this case. It's not an element of the crime.

*Id.* at 206:25 – 207:3. The Court found the Government had not, "in any kind of unfair [or] backhanded way, asked the jury to find that the tasing is what caused the death in this case." *Id.* at 207:4-6. The Court then ordered the Government not to do so. *Id.* at 207:7.

The Court finds, as agreed to by the Parties prior to Special Agent De Los Santos' testimony, the testimony about Narcan did not open the door to the medical examiner's report about cause of death, nor did Special Agent De Los Santos' testimony about Doe's respiratory distress open the door, because neither testimony closed off the possibility that Doe's death was caused by something other than tasing.

(ii) *Arguments during closing.*

The Government's only argument in its Response as to the charge of deliberate medical indifference is that Defendants received an unfair trial because of the Government arguments during closing. The Court first recounts the Government's arguments before explaining why Defendants received a fair trial on count three.

The Government argues it suggested a causal link four times. Resp. at 11, ECF No. 305. First, when the Government argued that a reasonably objective person would know Doe was

suffering from a serious medical need because (1) "he had been tased 14 times," (2) he appeared to be in distress in the back seat of Defendant Embly's police car based on the backseat video, and (3) he was "limp," "unresponsive," and "urinated all over himself" when he was taken out of the car. *Id.*; Tr. of Jury Trial Vol. VII of IX at 122:7-20, ECF No. 280.

Second, when the Government argued that each of the officers "clearly knew, based on everything we saw and heard, that [Doe], who had been tased 14 times, had a serious medical need, especially once they got over to the jail and saw his condition there, where he was unresponsive and had urinated all over himself." Resp. at 11, ECF No. 305; Tr. of Jury Trial Vol. VII of IX at 125:25 – 126:4, ECF No. 280.

Third, when the Government argued (1) that Defendant Embly should have known about a medical need because "[h]e was trained that (reading) [']Long or multiple TASER applications extend stress, pain, and metabolic effects[']" and "trained to (reading) [']Monitor someone after the TASER was used. And, if unresponsive, initiate EMS and CPR protocols,[']" Resp. at 11, ECF No. 305; Tr. of Jury Trial Vol. VII of IX at 127:24 – 128:6, ECF No. 280; (2) that Defendant Embly's previous medical training indicated his "not getting [Doe] medical care was willful" because Defendant Embly "knew what to do," Resp. at 11, ECF No. 305; Tr. of Jury Trial Vol. VII of IX at 128:24 – 129:11, ECF No. 280; and (3) that Defendant Mendoza underwent the same training and failed to properly monitor Doe, initiate CPR or EMS protocols, or call for medical care, Resp. at 11, ECF No. 305; Tr. of Jury Trial Vol. VII of IX at 129:12 – 130:2, ECF No. 280.

Finally, when the Government argued in rebuttal, in response to a defense argument that "the officers didn't realize that Doe's condition was grave and probably thought that he was intoxicated and was just sleeping it off," Resp. at 11, ECF No. 305, that "those people had not just been tased 14 times" and "[t]here's no way you can go from, 'Oh, we were—we just thought he

was sleeping it off' and take out the fact they had just tased him 14 times," *id.*; Tr. of Jury Trial Vol. VII of IX at 225:24 – 226:2, ECF No. 280.

Defendants did not object to any of these arguments. *See generally* Tr. of Jury Trial Vol. VII of IX at 122 – 226, ECF No. 280.

There were other mentions of the potential of the taser to cause death or serious bodily injury in closing, *see e.g., id.* at 98:20 – 99:10, although Defendants compelled the Government to make those arguments by insisting that the Government prove the taser was a dangerous weapon to meet the elements in each count, *id.* at 4:16 – 9:16.

Defendants did not object to any of these arguments either. *See generally* Vol. VII of IX at 122 – 226.

The Government's arguments in closing do not establish Defendants received an unfair trial on deliberate indifference to a serious medical condition. First, the Government argues that it insinuated the tasing killed Doe in its closing arguments. The Court disagrees. The Government framed its argument in two ways: (1) that a reasonably objective person should have realized an unresponsive person who had recently been tased fourteen times was experiencing a serious medical need and (2) that these officers, based on their taser training, should have realized it. While the jury was aware that Defendant died, at no time does the Government say or insinuate that Defendants knew, or a reasonable person would know, Doe had a serious medical need because Doe died, or that Doe died due to tasing. The Government mentioned his death just once, in arguing in rebuttal that the Defendants knew the impending investigation would be serious because "Someone is dead." *Id.* at 214:18. Defendant Mendoza's counsel, in contrast, mentioned it twice, both times when arguing that Doe "died" before the officers could get him medical care. *See id.* at 162:18-19, 172:11-12. Defendant Mendoza's counsel created a more natural link between the

tasing and Doe's death than anything mentioned by the Government. As for the dangerousness of the taser itself, Defendants' insistence that the Government prove the taser was dangerous, especially because the last charge was deliberate indifference to a serious medical need and "included the use of a dangerous weapon," Superseding Indictment at 3, ECF No. 53, only increased the pressure on the Government to emphasize the taser's potential to cause harm.

Second, the Government was also arguing that the Defendants should be convicted of excessive force. It is natural to link the excessive force to the serious medical need and argue the officers, having used excessive force, would be more aware of the potential for a serious medical need. The Court would find it odd if the Government had not done so. But the indications of Doe's serious medical need went far beyond the tasing. The Government notes in the first two excerpts above that Defendant was also unresponsive and had urinated on himself. The third excerpt does not include that information because it is an argument about the probative value of training on the willful element of deliberate indifference. And the fourth excerpt argued that Defendants should have considered the tasing in their assessment of his condition rather than only consider his apparent intoxication. The Court finds these normal arguments that do not insinuate the tasing caused Doe's death or attempt to convince the jury to convict Defendants on the charge of deliberate indifference to a serious medical need based on Doe's death.

The Court also finds, considering the closing arguments, that the instruction issued to the jury not to consider Doe's death or the cause of his death, Tr. of Jury Trial at Vol. VII of IX at 58:8-24, ECF No. 280, was sufficient to dispel any link between Doe's death and the charge.

The Court recognizes that, in cases like this one, it is impractical, if not impossible, to hide from a jury the fact that the victim died. And, in cases like this one, human nature means juries will speculate on cause of death. Juror #10's affidavit asserted they did so. ECF No. 291-1 ¶¶ 4-5.

The Court cannot delve into jury deliberations. *Hornung*, 848 F.2d at 1045. But the Court must trust that juries consider the elements of the crime charged and ignore those extraneous facts which necessarily arise during a trial, whether they appear to favor or disfavor defendants, when deciding whether to find a defendant guilty of a specific charge.

(e) *The Court did not err in excluding the medical examiner's toxicology report before trial, nor was trial unfair.*

In summary, the Court finds that its pretrial Rule 403 balancing test was correct. The Court was right to exclude evidence the officers did not know at the time: that the medical examiner's report found Doe had methamphetamine in his system and that the report found that Doe died from the toxic effects of methamphetamine. And the Court did not err in keeping that information out of evidence during trial. Nor did the Government's arguments at closing impermissibly insinuate that the jury should convict Defendants because Doe died or attempt to link Doe's death to the charge of deliberate indifference to a serious medical need.

The Government apparently regrets its decision to indict Defendants and is seeking to either get them a new trial or dismiss the charges entirely. The argument in its Response, however, is insufficient to do so. The Government's argument about excessive force and failure to intervene fails to point to any portion of trial which either opened the door for the toxicology report or where the Court erred in overruling an objection seeking to do so. That argument amounts to a wish that Defendants had testified about what they thought was influencing Doe or had secured an expert who could link his behavior to intoxication by methamphetamine. Defendants were free to do so and did not. The Government's argument about the deliberate indifference charge amounts to an argument that the trial was unfair because Defendants should have objected during closing but did not. The Court doubts it would have sustained such objections.

Defendants received a fair trial.

## IV. Conclusion

Defendants received a fair trial on all charges and were convicted by a jury of their peers. After sentencing Defendants are free to appeal their conviction to the Tenth Circuit.

Accordingly, it is **HEREBY ORDERED** that Defendant Mendoza's Motion for Mistrial, ECF No. 291, and the Government's request for a new trial, ECF No. 305, both joined by Defendant Embly, ECF No. 306, are **DENIED**.

Margaret Strickland

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE